John T. Sims *et al.* v. Leonard Daniels, *as County Clerk of Wyandotte County*.

No. 10730.

1. Australian Ballot Law — *tribunal under § 10 no power to decide which faction entitled to party name.* Where a political party in a county divides into opposing factions, and each faction holds a convention composed of a large number of delegates, and nominates a full set of candidates for the offices to be filled by the voters of the county, the county officers whose duty it is to consider objections to certificates of nomination, and nomination papers, have no power or authority to determine which of the two opposing factions is the true representative of the party, nor to exclude the candidates of either faction from the official ballot after the nomination of its candidates has been duly and regularly certified to the county clerk in the manner pointed out by the statute.

2. ————— *nor to enforce agreement between factions or candidates.* The officers so designated for the consideration of such objections have no power to consider and enforce written agreements made by the candidates and committees of opposing factions of a political party, providing for the settlement of their differences, and for a determination of the question as to which set of candidates is entitled to a place on the official ballot, and to the use of the party name. Agreements of candidates, even though in writing, to withdraw on the happening of a certain event or contingency, cannot be considered or enforced by such special tribunal.

*Original Proceeding in Mandamus.*

Writ Awarded.                    Opinion Filed December 5, 1896.

An alternative writ of *mandamus* was issued in this case on the application of John T. Sims, who claims to have been nominated at a Republican county convention of Wyandotte County, for the office of Probate Judge of that county, and other persons plaintiffs, claiming to have been also nominated at the same convention for various other county offices, and representatives of the several legislative districts in that county, and also H. T. Carson, for himself and others,

composing a delegate Republican convention in Wyandotte County, against Leonard Daniels, County Clerk of Wyandotte County, commanding him to place the names of the plaintiffs on the official ballot under the head of the Republican Party, or show cause before this Court why he had not done so. To this writ the County Clerk makes a long return, in which it is alleged, in substance, that in the year 1895, and for many years prior thereto, the supreme control of the Republican Party in the State of Kansas, and in Wyandotte County, except when in convention assembled, has been vested in the Republican State Central Committee, composed of a representative from each senatorial district in the State, which has absolute and supervisory control over the party and all subordinate republican committees in the State, which power has always been claimed, many times exercised, and never questioned by the members of the Republican Party; that on the 11th of April, 1896, there was in Wyandotte County a committee known as the Republican County Central Committee, subordinate to the State Central Committee, which had charge and control of the political affairs of the Republican Party in Wyandotte County; that a convention called by it to select delegates to a Congressional Convention was held on the 11th of April, 1896, which became involved in a bitter factional contest, and finally divided into two factions, and elected two sets of delegates; that other conventions for other purposes were thereafter called, and resulted in similar contentions and divisions, at one of which, another Republican County Central Committee was elected, thereby making two Republican county committees claiming the right to act in Wyandotte County; that each of said committees called a convention to nominate candidates

for state senator, the various county offices, and representatives in the State Legislature; that two conventions were held on different days, and the plaintiffs were nominated at the convention called by the old committee, and a full set of candidates were also nominated at the convention called by the other commitee; that afterward an agreement was made in writing, and signed by the chairman and secretary of each committee, and a majority of the members of each committee, and also by the various candidates, including the petitioners, by which it was agreed that each of said central committees should be dissolved; that said committees and said candidates should submit their differences, and the question as to which set of candidates should be the candidates of the Republican Party, to a primary election of the Republican voters of the county to be called and held under the direction and supervision of the Executive Committee of the State Central Committee; that the candidates receiving the greater number of votes should be the candidates of the party, and the committeemen receiving the greater number of votes should be the committee; that pursuant to said agreement the State Executive Committee called a primary election to be held on the 12th day of September, 1896, in accordance with the terms of the written agreement; that said primary election was held on said 12th of September, and resulted in the nomination of the persons who had been nominated, and the committee who had represented the faction opposed to the plaintiffs. It is further stated that the plaintiffs in violation of the terms of said written agreement fraudulently procured nomination papers to be made, and filed in the office of the County Clerk, purporting to nominate them for the various offices for which they claim to be candidates. It also

appears that on the 19th of October, 1896, the candidates opposed to the plaintiffs filed written objections to the nomination papers of the plaintiffs with the defendant as County Clerk; that the plaintiffs were notified thereof, and that on the 21st day of October, said contest board met, organized, and after hearing the evidence sustained the objections to the nomination papers of the plaintiffs. The grounds stated in the written objections to the nomination papers are very long, and include,—

"1. The pretended convention which nominated all of said persons, except H. A. Mendenhall, for said offices, was not a Republican convention.

"2. Said convention was not called by any person, or persons, authorized to call a Republican convention.

"3. The persons claiming to be, and to act as, delegates at said convention, were not elected by the Republican voters of Wyandotte County, but were elected, if at all, by ballot-box stuffing, or ballot stealing, by the use of tissue ballots, and fraudulent means.

."4. Said convention was not called, or ordered, by the Republican County Central Committee of Wyandotte County, Kansas; was not the Republican convention; the delegates were not elected as delegates to such convention; and said convention was called and held in violation of the established usages and customs of the Republican party of Wyandotte County, Kansas."

The fifth ground of objection states circumstantially and at great length the manner in which the Republican Party of Wyandotte County became divided into factions, and the holding of the various conventions in that county, the agreement of the candidates and opposing committees to submit their differences to a primary election, the holding of the primary election and the result thereof; and the filing of certificates of

nomination of E. S. W. Drought, and others, opposed to the plaintiffs for the various offices. It was shown at the hearing in this Court, that before the last primary election was held the plaintiffs published in certain papers in Wyandotte County, a notice to the voters withdrawing from the contest at the primaries, announcing that they would not be bound thereby, and would insist on being candidates under their original nomination. The case in this Court has been submitted by counsel on the return and certain statements of facts by counsel on both sides.

*L. W. Keplinger*, for plaintiffs in error.

*McGrew, Watson & Watson*, and *A. L. Berger*, for defendant in error.

ALLEN, J. Section 10 of chapter 78 of the Laws of 1893, known as the Australian Ballot Law, provides:

"The certificates of nomination, and nomination papers being so filed, and being in apparent conformity with the provisions of this act, shall be deemed to be valid, unless objection thereto is duly made in writing. Such objections or other questions arising in relation thereto in the case of nomination of state officers or officers to be elected by the voters of a division less than the state and greater than a county, shall be considered by the secretary of state, auditor of state and attorney general, and the decision of a majority of these officers shall be final. Such objections or questions arising in the case of nominations for officers to be elected by the voters of a county or township, shall be considered by the county clerk, clerk of the district court and county attorney, and the decision of a majority of said officers shall be final. . . . In any case where objection is made, notice shall forthwith be given to the candidates affected thereby, addressed to their place of residence as given in the nomination papers, and stating the time and place, when and where such objections will be considered."

The questions in this case are as to the extent of the inquiry which the County Clerk, Clerk of the District Court and County Attorney may make under objections filed to certificates of nomination, and the force and finality of their determination. As to the extent to which the interests of the public, the parties to this case, or the political party to which they adhere will be affected by the determination of the controversy we are not advised; but the question involved is of the utmost importance to the people of the State. It relates to the freedom of expression at the ballot-box, of the will of the voters, and to the power of the special tribunal created by the statute to determine what nominations may, and what may not, be submitted through the instrumentality of the official ballot to the electors for their suffrages. The language of the statute is far from being clear or explicit. On the one hand, it is contended that where objections to nomination papers are filed the inquiry is limited to matters of form, and at most to questions as to the genuineness of the papers themselves. On the other hand it is claimed that this tribunal has ample power not only to determine all questions as to the regularity and genuineness of the certificates themselves, but also to go behind the certificates, and inquire whether a convention was, in fact, held, whether it represented the political party it claimed to represent, and whether the action of a political convention has been subsequently abrogated and superseded by the lawfully constituted party committee or authority. The question is suggested at once whether the law contemplates that political parties are to be treated as well-defined divisions of the people, having the right, not only to nominate candidates, but to enforce disci-

1. Tribunal has no power to decide which faction entitled to party name.

pline among their members, prevent factional strife, and dictate as to the use of the party name. Authorities are cited, which in some of the language used, if not in the decisions of the cases, seem to recognize this view. In the case of *The State, ex rel. O'Malley, v. Lesueur*, 103 Mo. 253, it was said :

"And, aside from testimony to that effect, it would seem inherently necessary in *all* party oganizations that there should be some governing head, some controlling power, some common arbiter, which, if an emergency should arise therefor, can lay its hand on the heads of warring factions within the party, and compel the observance of wholesome regulations conducive alike to efficient party organization, order, fair dealing, and good government. Certainly a court of justice could not look with unpropitious eye upon all proper rules which would protect every citizen in the untrammeled exercise of their choice in selecting those for whom they desire that their suffrages shall ultimately be cast. The same considerations which should induce courts of justice to maintain the purity of the ballot-box, when the final vote is taken, should equally operate with them to promote honesty and condemn fraud when a preliminary vote is taken, or a nominating convention held."

There is language of somewhat similar import in the case of *In re Redmond*, 25 N. Y. Supp. 381. In the case of *Chapman v. Miller*, 52 Ohio St. 166, the Supreme Court of Ohio held valid, and enforced, the decision of the Secretary of State as to certain nomination papers, without discussion of the broad question we are now considering. It will be observed that in the case under consideration no question is presented as to the regularity of the nomination papers of the plaintiffs, as to the genuineness of the signatures attached thereto, nor yet as to the fact that a convention was held at the time and place stated

therein which nominated the plaintiffs as its candidates. There is not even a question presented as to the fact that this convention was called and held as a Republican convention. It is admitted in the return of the County Clerk, and in the objections which were filed before the county officers, that the Republican Party of Wyandotte County was divided into two factions; and that a convention for the nomination of county officers was held by each faction of the party, and a full list of nominations was made by each. The attack on the right of the plaintiffs to have their names appear on the official ballot.is based on what has transpired subsequent to the convention. It is not claimed that the convention which placed plaintiffs in nomination has ever reconvened and reversed its action, nor that the convention has ever taken any subsequent action in reference to the matter, nor that the plaintiffs have ever withdrawn from being candidates. But it is claimed and shown that an agreement was entered into between the rival candidates and committees, to the effect that a primary election should be held under the primary election law, and the claims of the rival factions referred back to the Republican voters of the county. It is contended by the defendant that this was done, that the decision of the voters was against the plaintiffs, and that the board of county officers provided for in section 10 had a right to take cognizance of this agreement and enforce it. On the part of the plaintiffs it is claimed that before the primary election was held, influences were brought to bear by the State Committee against them and in favor of the other faction; and that thereupon, and before the election, they withdrew from the arbitration, if it may be so termed, and advised their faction to take

no part in the primary election.    It is shown that
a notice of this kind was published by the plaintiffs.
The substantial question then is whether the special
tribunal had power, under the law, to enter into an
investigation of these matters, to determine the rights
of the opposing factions, and to place the candidates
of one of them on the official ballot and exclude the
other.    If they have this power it certainly is one of
vast importance ; for if they might exclude the plain-
tiffs, they might equally, on like objections, have ex-
cluded the opposing faction and have placed the
names of the plaintiffs on the ballot instead.    As
the statute makes their decision final, and no appeal
is given to any court or tribunal, if they have full
and exclusive jurisdiction of all such controversies,
there would seem to be no limit whatever to their
power to exclude the candidates of any convention
or political party against whose nominations objec-
tions might be filed.    The State Board, under this
construction of the law, might decide between oppos-
ing factions in the party to which they owe their own
election, or in the opposing party, and absolutely ex-
clude from the ballot the opponent most dangerous to
them.    The fact that power is liable to abuse is not
necessarily a valid objection to its existence.    But the
liability to such abuse may and ought to be taken into
consideration, in a case of doubt, in determining
whether or not the Legislature intended to confer it.
The Court will take judicial notice of the fact that in
a large percentage of elections, the officers designated
as tribunals to determine these controversies are them-
selves candidates before the people at. the election,
directly interested in the result, and, therefore, directly
interested in the determination of the questions pre-
sented to them.    It is to their interest to avoid factions

within their own party, and to cause divisions and discord in the ranks of their opponents. Prior to the passage of the Australian Ballot Law any faction of any party, or any citizen, or number of citizens, was at liberty to print and circulate tickets to be used at the election, containing whatever names the authors of the ticket saw fit to place thereon, subject only to punishment for the fraudulent use of party names or headings. Can it be supposed that the Legislature in passing this law intended to strengthen party machinery, and the domination of party leaders and party committees over the members of their political organizations? Can the courts recognize, as was said in the case of *The State, ex rel. O'Malley, v. Lesueur*, supra, a supervisory control by party committees over the individual members of the party when they are disposed to divide into factions? One of the great evils in our system, against which the better elements of all parties have cried out, is the domination of the party bosses and the undue influence of what are termed machine politicians. It seems to us that the courts, at least, should treat political parties as at all times purely voluntary associations of absolutely independent citizens, who are at perfect liberty to sever their connection with the political party to which they have adhered, at any moment when they deem it right to do so; that they may divide into such groups as may please them, and that courts and tribunals created under the law are not authorized in any case to enforce discipline upon the members of a political party at the call of committees, candidates, or any one else. In the exercise of his right to vote the American citizen is an absolute sovereign. He owes no allegiance, save to his country and his fellow citizens. It is his unmixed duty to cast his ballot as he deems for the

36—57 KAN.

best interest of himself and those who are affected by the result of the election. In performing this duty, no partisan authority has rights over him. No official, high or low, may interfere with him. And in construing laws affecting the suffrage of the citizen, that construction should always obtain which affords the citizen the greater liberty and freedom of choice.

It is urged that frauds may be perpetrated by placing on the official ballot the names of persons as candidates of a political party who are not such in fact; and that the voters may be thereby misled and deceived into casting their ballots in a manner which fails to express their real wishes. That there is force in this suggestion must be conceded. It is possible that the Legislature may hereafter deem it wise to restrict in some manner the multiplication of candidates on the official ballot. But the question now presented is, where rival factions in a political party each puts forward candidates, whether the board, which must act on objections within a very few days after they are filed, and which is given none of the powers usually and necessarily conferred on courts of compelling the attendance of witnesses and the production of papers and of enforcing obedience to its mandates, may finally and conclusively determine the rights of the opposing factions; place the candidates of one on the official ballot, and exclude those of the other; or whether the people themselves at the election have the sole and exclusive power to determine which is the false, and which the genuine? This they certainly might have done under the law as it was before the passage of the act under consideration; and we do not think it was the purpose of the Legislature to take this right away from them, or authorize any set of public officials to

2. Tribunal cannot enforce agreement between factions.

do so.    Cases involving substantially the same ques-
tion have been passed on by the courts of neighboring
States.    In the case of *Shields v. Jacob*, 88 Mich. 164,
it was decided :

" When the call for a convention of a political party,
results in the holding of two nominating conventions,
it is not the province of the board of election commis-
sioners to determine which convention represented the
*regular* nominating convention of the party, but it is
their duty to place upon the ballot the names of the
candidates certified to them by the committee of either
branch of the party represented by the two conven-
tions ; and if the name of a party shall be certified by
each of the two committees, it is the duty of the com-
missioners to print the names so certified without
further addition or distinctive designation than such
as is contained in the certificate so furnished."

And in the case of *The State v. Allen*, 43 Neb. 652,
it was held :

" Where two factions of a political party nominate
candidates and certify such nominations to the secre-
tary of state in due form of law, the latter will not in-
quire into the regularity of the convention held by
either faction, but will certify to the several county
clerks the names of the candidates nominated by each,
such practice being in harmony with the rule which
requires courts, in case of doubt, to adopt that con-
struction which affords the citizen the greater liberty
in casting his ballot."

And in the recent case of *Phelps v. Piper*, 67 N. W.
Rep. (Neb.) 755, in a carefully considered opinion it
was said :

" Political parties are voluntary associations for
political purposes.    They establish their own rules.
They are governed by their own usages.    Voters may
form them, reorganize them, and dissolve them at
their own will.    The voters ultimately must determine
every such question.    The voters constituting a party

are, indeed, the only body which can finally determine between contending factions, or contending organizations. The question is one essentially political, and not judicial, in its character. It would be alike dangerous to the freedom of elections, the liberty of voters, and to the dignity and respect which should be entertained for judicial tribunals, for the courts to undertake in any case to investigate either the government, usages, or doctrines of political parties, and to exclude from the official ballots the names of candidates placed in nomination by an organization which a portion, or perhaps a large majority, of the voters professing allegiance to the particular party believed to be the representatives of its political doctrines and its party government."

In the case of *The People, etc., v. District Court, etc.,* 18 Colo. 26, it was said in the syllabus that " it is not the province of either executive or judicial officers to give official sanction to the mere course, regularity or genuineness of any political organization as such." These cases were decided under statutes substantially like ours, and fully sustain the proposition that no power is vested either in the special board provided by the Australian Ballot Law or in the courts to pass on the merits of the claims of rival factions of a political party ; but that where both hold conventions and nominate candidates, both must be recognized, and given a place on the official ballot. The Supreme Court of Missouri, in the case first cited, holds, that there was a valid agreement to arbitrate ; that the award was made in accordance with that agreement, which was binding on the parties. We have very serious doubts whether the courts can take cognizance of and enforce such agreements with reference to controversies of this character. But if the position of that Court be sound, there was an express withdrawal by the plaintiffs from the submission in this

case before the primaries were held, and the award made. The general rule is well established, that an agreement to arbitrate may be revoked at any time before final submission. It seems to us, however, a matter of politics rather than of contract. In conclusion, without attempting to lay down a definite fixed rule limiting the inquiry of the county officers named on objections to a certificate of nomination, we hold that they have no power to inquire into the rights of opposing factions of a political party, nor to enforce agreements with reference to the withdrawal of one or another set of candidates after their nomination by a convention, nor to give effect to any supervisory power or control of party state committees over local party organizations; that after the candidates have once been nominated by a convention held by a party or faction of a party and genuine certificates in due form have been filed with the proper officer, the names must be printed on the official ballot under the heading of the party which they claim to represent, unless such candidates withdraw in the manner indicated by the statute.

A premptory writ is awarded as prayed for.

MARTIN, C. J., concurring.

JOHNSTON, J. (dissenting). In my view the plaintiffs are not entitled to the relief which they ask. While they had been named in a manner as the candidates of one of several conventions held in Wyandotte County, they had long before relinquished their claims as candidates and agreed to a reorganization of the Republican Party and to the nomination of another ticket. Dissensions had arisen in the Republican Party in that county. Two conventions had been held in the month of July, 1896, and two separate tickets had been

brought out, each claiming to be the Republican ticket and that the other was not entitled to recognition. The Republican State Central Committee, which has supreme control over the party and the subordinate organizations within the party, took cognizance of the dissensions, and through its intervention it was agreed that there should be a reorganization of the party in that county; that the central committees claiming to exercise local control should be then and there dissolved; that a statutory primary election should be held under the supervision of the State Central Committee, the polls to remain open from 8 o'clock in the morning until 7 o'clock in the evening, at which a new central committee should be chosen and also candidates for the local offices, who should be regarded as the Republican ticket for that county. The agreement was in writing, signed by the candidates and by the officers and members of the several committees, all of whom stipulated that they would unite in the earnest support of the ticket chosen at the primary election. September 12, 1896, was fixed as the time for holding the primary election, due notice of the same was given, and the choice of a ticket was thus remitted to the Republican electors of the county. A ticket was chosen by an unquestioned majority over the plaintiffs who were voted for, and there is no claim of fraud in that election. The ticket then chosen has been recognized by the Republican State Central Committee as the Republican ticket of Wyandotte County and entitled to a place upon the ballot as such. It appears that according to party usage and precedent the Republican State Central Committee had authority to intervene in the settlement of the dispute and in the reorganization of the party. The plaintiffs submitted to the

authority of that committee and consented to relinquish their former claims and abide the decision of the people at the primary election. Their agreement having been acted upon, the election held, and the ticket named, they should not now be allowed to repudiate their agreement nor to defeat the choice made by the electors at the primary election. In a very similar case the Supreme Court of Missouri held that an agreement and submission by candidates under substantially similar circumstances as arose in the present case were binding on the candidates and precluded them from thereafter insisting upon their former *status* or rights as candidates. Chief Justice SHERWOOD, who pronounced the judgment of the Court, remarked that candidates could not claim the benefits of party organizatlon and at the same time deny the obligatory force of reasonable party regulations, and that the course pursued was in the interest of order, fair dealing, and good government. *The State, ex rel. O'Malley, v. Lesueur,* 103 Mo. 253.

Another reason why the writ of *mandamus* should not issue is the fact that the tribunal provided by law for the decision of such questions has determined that the plaintiffs are not entitled to a place on the ballot as the nominees of the Republican Party. The Legislature recognized that questions would arise as to the regularity of party nominations and as to which one of several tickets was entitled to use the party designation, and in the interest of order and fairness provided tribunals to determine these questions. Objections or questions in relation to state or district nominations are to be considered and decided by a tribunal composed of the Secretary of State, Auditor of State and Attorney General, and as to county or township nominations by a tribunal composed of the

County Clerk, Clerk of the District Court and County Attorney. In each of these tribunals there are officers authorized to administer oaths, and the statute provides that objections or questions to be raised shall only be heard upon notice which shall fix the time and place of the hearing. It is provided that their decisions, when made, shall be final. § 10, ch. 78, Laws of 1893. There can be little doubt that such a question as we have before us is included within the terms of the statute. In most of the States the inquiry of the tribunal is limited to objections, but lest a too restricted view should be taken in this respect our statute provides not only for objections to nominations, but for the consideration and decision of "other questions arising in relation thereto." In Ohio, tribunals have been created for a similar purpose and their power has been broadened like our own, so that they consider and decide objections and *other questions* relating to nominations. Two conventions were there held by persons claiming to be representatives of the People's Party and two tickets had been nominated, each of which asked for a place upon the ballot as the People's Party ticket. Objections being made a hearing was had before the proper tribunal, where it was decided that one of the tickets was regularly nominated and was entitled to be placed on the ballot as the People's Party ticket. The decision of the tribunal is final there, as well as here; but notwithstanding the importance and finality of the decision the Supreme Court of Ohio upheld the statute and the exercise of such power by the statutory tribunal, and further held that when the decision is made by that tribunal the courts are powerless to interfere. *Chapman v. Miller*, 52 Ohio St. 166. See, also, *The State, ex. rel. O'Malley, v. Lesueur*, supra; *In re Redmond*,

25 N. Y. Supp. 381.   Our statute is plain; and it seems to me that the power is plainly conferred, and that in this instance it was rightfully exercised.

It was urged that the power was liable to be abused because the officers designated as tribunals to determine these controversies are likely to be interested in the result of the election, but this consideration is entitled to very little weight.   We cannot assume that they will act dishonestly or abuse the power that is confided in them.   The judges of the courts have political opinions and are generally adherents of some of the political parties, but they are not for that reason relieved from the duty and responsibility of determining questions like these, however disagreeable the task may be.   Questions of this character must be decided by some one, and it is for the Legislature to determine where that power shall be vested.   The courts need not be concerned about the wisdom or policy of the legislation.   We cannot disregard the legislative declaration because it may appear to us not to be the best policy, nor because, as has been suggested, the managers of political parties may sometimes be actuated by selfish or sinister motives.   It has also been suggested that the exercise of the power would tend to strengthen party machinery and the domination of party leaders, but this case does not afford an illustration of such peril, as the steps that were taken were to depose the existing managers and committees and to submit to the Republican electors the question as to who should be their party leaders and candidates.   All know that under our system of government the preliminary steps in elections and the choice of officers are carried on through the political parties, their organizations and representatives; and necessarily there must be rules and regulations for their guidance and control.   The

important part which they take in state affairs does not rest upon mere usage or acquiesence, but is recognized in numerous statutes, and especially in those providing for primary elections to nominate candidates (ch. 115, Laws 1891), and in the Australian Ballot Law, which contains the provision which is now under considera- tion.   The existence or control of political parties, however, does not necessarily interfere with the rights of the individual voter, who is at liberty to sever his party relations at any time and resume them again at will.   New parties may be organized and new asso- ciations formed without limit.   Besides, provision is made for the proposal of candidates and tickets by petitions, upon which only a few names are required. The ballot law contains some restrictions, but they are supposed and intended to be in the interest of a fair and honest expression of the will of the voters. It is true, as has been suggested, that before the en- actment of that law any one might print and circulate as many kinds of ballots as he desired, but this policy was deemed to be unwise.   It was sometimes used to mislead and defraud the voters, and hence the law was changed so that we have but a single ballot, prepared under the supervision of public officers and as the law directs.   Each political party is entitled to have its ticket placed upon that ballot under the party designation, so that its adherents may intelligently vote for their party candidates.   While other tickets may be brought out by dissatisfied or independent elements in a party, such elements have no right to borrow or misappropriate the party designation, as that would necessarily tend to confuse and deceive the voters.   The People's Party nominated a State ticket in Kansas the present year, and the persons named have been cer-

tified as the candidates of that party and are entitled to be placed upon the ballot under the heading of the People's Party. Suppose another convention had been called by some of the same party in northern Kansas and another ticket had been named, and suppose another convention of the same party should be held in southern Kansas, and another in western Kansas, and still another state convention should be held in some remote county by a few members of the People's Party, and that each of these conventions should nominate a state ticket and ask to have it placed upon the ballot as the regular People's Party ticket : would each ticket be entitled to a place on the ballot under the party designation, or could all be grouped together in one column under a single heading? To prevent abuses of this character the Legislature, intending that each party should only make a single nomination, provided a tribunal to determine, among other things, disputed questions in relation to nominations ; and that it has authority to determine which is the regular organization and entitled to use the party designation has heretofore been the accepted theory of the ballot law. It was so decided by the District Court of Shawnee County in a controversy over a congressional nomination about two years ago, and the power has been repeatedly exercised by both State and county officers. If these tribunals cannot determine questions like this, it would seem that nothing remains for their decision beyond the mere question of the form or the genuineness of the certificates. But that this was not the legislative purpose is shown by the provision which leaves the matter of form to the officer with whom they are filed. If the certificates are in apparent conformity with the law, they are deemed to

Sims v. Daniels.

be valid ; and the tribunal in question is only called when objections are made or other questions are raised in relation to the nomination. Evidently it was not the intention of the Legislature that this tribunal should be called to consider and decide mere matters of form or as to the genuineness of the papers. In my view, it was intended that they should determine questions like the one before us ; and the exercise of such power by them would tend to promote the purposes for which the ballot law has been enacted. The cases mentioned in the prevailing opinion, which it is claimed hold to a different view, are not based upon statutes like our own. As has already been noted, the Legislature in conferring power upon the tribunal has not confined it to mere objections, but has extended it to "other questions" in relation to the nominations. The power is lodged with important officers in each tribunal, and, recognizing that legal questions would arise for decision, it is provided that the Attorney General shall be a member of the state tribunal and the County Attorney of the county tribunal. Instead of disposing of the questions arising in a summary way, which seems to be authorized by the statutes of some of the other States, these tribunals can only act upon the matters submitted to them after due notice has been given to the interested parties. These notices fix the time and place when a hearing will be had, and there is time for a full presentation and deliberate consideration of the facts in controversy.