STATE EX REL. SCHARNIKOW, RELATOR, *v.* HOGAN, RESPONDENT.

[No. 1613.]

[Submitted October 13, 1900.  Decided October 16, 1900.]

*Elections—Nominating Conventions—Judicial Nominations— Qualification of Delegates—Party Custom—Evidence— Constitutional Law.*

1. Constitution, Article III, Section 1, provides that "All political power is vested in and derived from the people." This guaranty refers as well to the right of naming of candidates for public office as it does to the right of the electors to vote for the candidates at the polls.

2. A mass meeting in one of two counties composing a judicial district, called without notice, except to those present at the final adjournment of a regular county convention, for the announced purpose of formulating a protest to the action of the convention, has no authority to name delegates to represent the county in a state and judicial convention in place of those named by the regular county convention; and delegates named by such meeting, though recognized and seated by the state convention, have no authority to represent the county in the judicial convention, and a nomination made by it is invalid, because the electors of both counties are not represented.

3. Under Constitution, Article VIII, Section 12, the right to nomininate and elect district judges belongs to the electors of the district, and no action of a state convention can validate a nomination for the office of district judge, where the convention making it does not properly represent the electors of the district.

4. In a contest involving the validity of a nomination made by a judicial convention, proof that the delegates claiming to represent one of the counties composing the judicial district had been recognized and seated by a state convention of the party, and that it was the custom for delegates to the state convention from counties composing judicial districts to form judicial conventions during the sitting of the state convention. and to nominate candidates for judges in their districts, whether authorized by the electors of their respective counties or not, was immaterial where the delegates so recognized had been chosen by a mass meeting which was illegal because called without notice.

5. In a contest involving the validity of a nomination made by a judicial convention it was shown that it had been a party custom in the state for delegates to a state convention from counties composing judicial districts to meet in separate judicial conventions, and there nominate candidates for district judges; but it did not appear that such nominations had ever been made without express authority in the delegates to do so, except in one case. *Held* insufficient to establish that it was the custom of such delegates to nominate candidates for judges, whether authorized by the electors of their respective counties or not.

ORIGINAL application by the state of Montana, on the relation of Edward Scharnikow, against Thomas S. Hogan, as secretary of state of the state of Montana, for writ of mandate to compel him to certify to the relator's nomination. Dismissed.

### STATEMENT OF THE CASE.

This is an application for a writ of mandate to compel Thomas S. Hogan, as secretary of state, to certify to the county clerks of Deer Lodge and Granite counties, respectively, to be printed upon the official ballot, the name of Edward Scharnikow as the regular democratic nominee for district judge for the Third judicial district, which is composed of said counties.

Omitting formal matters, the facts appearing from the proof, and the admissions of the parties, showing their respective claims and contentions, are the following: The regular democratic central committee of Deer Lodge county, through its chairman and secretary, upon proper notice, called a convention of democrats of Deer Lodge county to assemble at Deer Lodge on September 17, 1900, for the purpose of nominating candidates for county offices and for the legislative assembly, and to name delegates to represent the county in the state convention, which had been regularly called to assemble in Helena on September 19th. The convention was

also authorized by the call to take proper steps, in conjunction with the party authorities in Granite county, to nominate a candidate for district judge for the Third judicial district. In answer to this call there assembled in Deer Lodge, on the day appointed, 129 delegates, representing all the precincts in the county.    There were no contesting delegations, nor was the right of any delegate to his seat questioned.    The convention organized, completed its business, and adjourned about 1 o'clock on the following morning.    After the business provided for in the call had been concluded, and immediately before adjournment, the following resolution was adopted by the convention, some 33 of the delegates protesting and voting against it:

"Be it resolved, that John R. Toole, John Madden and Thomas McTague are hereby elected as the executive committee, who shall have power to fill all vacancies in the county and legislative tickets, to adopt a name for the ticket, and to pass such resolutions as may or may not be necessary to have a ticket placed on the ballot in its proper place under the state ticket, so that the same may become a part of the ticket nominated at the state convention, and to transact such other business as is usually transacted by executive action."

These committeemen were members of the convention.    At the time of the assembling of this convention there existed certain factional differences among the delegates, growing out of local matters and the candidacy of a certain member of the party in Montana for the United States senate.    The majority faction, consisting of 96 of the delegates, was led by John R. Toole.    The remaining 33 delegates, who were under the leadership of the relator herein, interpreted this resolution to mean that the majority faction anticipated a split in the coming state convention upon the subject of the United States senatorship, and that in case such a split should occur, and the delegates selected by that convention and those who sympathized with them should conclude to retire from the state convention, and nominate a state ticket under some other party designation or name, the committee mentioned therein should,

in such event, be empowered to give such new name to the Deer Lodge county ticket also, and thus to withdraw it from the democratic party.

Immediately upon the adjournment of the convention the relator called upon all the delegates present, and all other democrats who agreed with him, to remain and organize for the purpose of formulating a protest against this contemplated action of the majority faction before the state convention at Helena. Thereupon the convention dispersed. The 33 delegates representing the minority, including the relator, with a number of spectators, remained in the hall, and immediately organized a mass convention by selecting, respectively, as chairman and secretary, J. M. Simpson and W. W. Goodman. The meeting thereupon adjourned until 9 o'clock the same morning, when it reassembled for the purpose of carrying out the objects for which it was called. Fifty or sixty persons,— including the 33 protesting delegates,—claiming to represent the regular democrats, took part in the meeting. No other notice was given of the mass meeting than the announcement made at the time the same was called on the morning of the 18th, except such as may have been disseminated over the county by the dispersing members of the convention, and by the publication of the fact of such meeting, as an item of news, in the Butte Miner, a daily newspaper published that morning in Silver Bow county, and the Anaconda Standard, also a daily newspaper, published in Deer Lodge county, at a distance of about 30 miles from the place of the meeting. The mass meeting proceeded to business, and selected 63 delegates to the state convention, the county being entitled to that number in the state convention under the call of the state central committee. Three of these were also named among the delegates selected by the convention. What powers were conferred upon these delegates by the mass meeting the proof fails to disclose further than may be inferred from the call under which it assembled. As many of these delegates as could be notified, to the number of about 50, took the afternoon train for Helena to attend the state convention. At

Helena they presented their claims to the convention through the committee on credentials, insisting that they were the regularly accredited delegates to that convention to represent the democrats of Deer Lodge county. The 63 delegates chosen by the regularly called convention of the 17th also presented their credentials, claiming to be the such regularly accredited delegates. The mass meeting delegates were led by J. M. Kennedy; the other delegates were under the leadership of John R. Toole. For convenience they are hereafter referred to as the Kennedy and Toole delegates. After examination into the merits of these contending claims, the committee on credentials reported to the convention in favor of seating the Toole delegates.

There were similar controversies before the committee on credentials between contesting delegations from Ravalli and Silver Bow counties, the main point in the controversy in each of these counties being the same as in Deer Lodge county. The committee on credentials, in the same report in which they recommended the seating of the Toole delegates, also recommended that the delegates from Ravalli and Silver Bow counties—who were in sympathy with the Toole delegates— be declared not entitled to seats in the convention. This report was adopted by the convention. Thereupon 60 of the 63 Toole delegates and 10 of the 13 delegates from Granite county (13 being the full number to which the latter county was entitled), who also sympathized with the Toole delegates, but over whose right to seats in the convention there was no controversy, withdrew from the convention, and retired, in company with the repudiated delegations from Silver Bow and Ravalli counties, to another hall, for the purpose of consultation. This was late in the evening of the 19th. The delegates thus assembled organized by electing a chairman and secretary and appointing a committee to formulate an address to the people, and to make recommendations as to their future course. An adjournment was then taken until noon on the following day. In the meantime, at 10 o'clock on the following morning, the 60 Toole delegates from Deer Lodge county and 10 of the 13

delegates from Granite county, being those who had retired ·
from the convention on the evening before, assembled as a
judicial convention, and nominated Welling Napton as the can-
didate of the Democratic party for judge of the Third judicial
district.   On the same morning, but after this nomination was
made, the state convention reconsidered its action upon the
report of the committee on credentials of the day before in so
far as it declared the Toole delegates entitled to seats in the
state convention, and by resolution declared that, inasmuch as
60 of these had withdrawn from the convention, and had re-
fused to be further bound by the rules and regulations of the
Democratic party of Montana, 28 persons named in the reso-
tion, constituting a part of the contesting delegation, together
with the 3 of the Toole delegates who did not join in the bolt,
were entitled to seats in the convention in their stead.   It was
further declared by the convention that the delegates so seated
were entitled to cast the entire vote of Deer Lodge county
upon all questions coming before the convention and ''before
the district convention to select a candidate for judge of the
district court for the Third judicial district.''   The member
of the state committee subsequently selected by these dele-
gates so seated from Deer Lodge county was also instructed
by the convention to call a convention of the supporters of the
party principles and candidates of the state convention in the
county of Deer Lodge· to select candidates for county offices,
and to transact such other business as might properly come
before a county convention of the Democratic party.   At 12
o'clock on the same day the 3 delegates from Granite county
who had not retired from the convention with their associates
and the 31 seated delegates from Deer Lodge county met and
formed a judicial convention for the Third judicial district,
and nominated Edward Scharnikow, the relator herein, as the
candidate of the Democratic party for judge of the Third judi-
cial district.

The call for the county convention of Granite county at
which the delegates to the state convention were selected con-
tained no reference to the office of district judge, nor did the

convention of that county—so far as the proof shows—authorize the delegates to the state convention to join with the delegates from Deer Lodge county to the same convention in nominating a district judge.   The record does not show whether the
convention of Deer Lodge County authorized the Toole delegates to join in a judicial convention.    The mass meeting held
in Deer Lodge county, claiming to represent the Democratic
party,  gave no instructions to the Kennedy delegates to unite
with any delegation from Granite county in the selection of a
candidate for district judge.   At noon on the 20th the bolting
delegates from the state convention reassembled pursuant to
the adjournment taken on the evening of the 19th, and took
steps which resulted in a call for a state convention of Independent Democrats to assemble in the city of Butte on Octotober 2d.   Such a convention did assemble, consisting of delegates selected in the various counties through the medium of
primaries and county conventions.   Through the organization
thus affected a full  "Independent Democratic" state ticket
was nominated, and also county tickets in most of the counties
in the state.   The county convention held in Deer Lodge
county named the same ticket as that nominated by the regular convention of September 17th.

That the state convention at Helena seated only 28 of the
Kennedy delegates is accounted for by the fact that, after the
convention seated the Toole delegates on the 19th, all the
Kennedy delegates except this portion of them dispersed to
their homes.

Proof was offered and admitted, over objection, which tends
to show that it has been the practice of the Democratic party
in this state, until it has grown to be the established custom,
for the delegates to the state convention from counties comprising judicial districts to form a judicial convention during
the sitting of the state convention, and to nominate a candidate for the judgeship in their district, whether given authority by the electors of their respective counties or not.

The judicial conventions which nominated Edward Scharnikow and Welling Napton each filed a certificate of nomination

of its candidate as the regular Democratic nominee with the secretary of state. He having refused to certify the name of Edward Scharnikow as that of the regular nominee, this proceeding was instituted to compel the performance of that duty.

*Mr. N. W. McConnell, Mr. T. O'Leary,* and *Mr. J. B. Clayberg,* for Relator.

*Mr. T. J. Walsh,* for Respondent.

MR. CHIEF JUSTICE BRANTLY, after stating the case, delivered the opinion of the Court.

The relator's argument is that the delegates chosen in the counties composing judicial districts to represent them in the state convention called to nominate a state ticket are authorized by the practice which has prevailed in the Democratic party in this state, until it has grown to be an established custom, to join in a judicial convention, and nominate candidates for the district judgeships, without regard to whether they have been directed by the electors, through the county conventions, to do so or not; that the bolting delegates from Deer Lodge and Granite counties, by their behavior in refusing to participate in the state convention, put themselves without the pale of the Democratic party, and thus lost their power to act in the judicial convention; that the action of the state convention in seating the Kennedy delegates from Deer Lodge county, with the three Toole delegates who retained their seats, constituted those the regular delegates, and clothed them with the authority to join with the loyal delegates from Granite county, and to make the nomination of relator; that the state convention is the supreme judicatory within the party to which appeal can be taken by contending factions, each claiming to represent the party principles, and to be entitled to bear the party name, and that its determination of the contention is conclusive upon the party and upon the courts, both as to state and local tickets; and, therefore, that the relator, having been

nominated by delegates thus recognized by the state convention, is the regular nominee of the Democratic party in the Third judicial district, and is entitled to have his name printed upon the ballot under the regular party designation.

Counsel for the defendant, not admitting the correctness of this reasoning, contend that, even if it be conceded to be sound, yet the nomination of relator was, upon his own showing, not made in conformity with the law, in this: That the mass meeting which selected the Kennedy delegates was not itself such a convention or primary meeting as is, under the law, authorized to nominate a ticket, and have it placed upon the official ballot under any party designation, and, therefore, that it could not select delegates for this purpose to act in a judicial convention, notwithstanding the fact that these delegates were recognized and seated by the state convention. In this contention we think the defendant is sustained both under the law and upon principle.

1. "All political power is vested in and derived from the people." (Constitution, Section 1, Article III). This guaranty, under our system, refers as well to the right of naming of candidates for public office as it does to the right of the electors to vote for the candidates at the polls. The purpose of the Australian ballot law is to prevent fraud, bribery, intimidation, undue influence, and other methods of interference with the free exercise of the right of suffrage by the electors, by providing for the absolute secrecy of the ballot, thus minimizing, as far as possible, these vicious influences. To this end it became necessary to print the ballot by public authority. This again required suitable regulations for the time and mode of making nominations by political parties, so that the officers intrusted with the duty of preparing and printing the ballot might be guided to a proper performance of their duties. Incidentally it was further necessary also to secure to the electors of political parties the right to conduct their own party proceedings through the medium of the convention and primary, free from interference from without. The provisions regulating the mode of making nominations are found in Sec-

tions 1310 to 1322 of the Political Code.    Section 1310, *supra*, defines a convention or primary meeting as follows: ''A convention or primary meeting within the meaning of this chapter is an organized assemblage of electors or delegates representing a political party or principle.''    In speaking of this definition in *State ex rel., Woody,* v. *Rotwitt,* 18 Mont. 502, 46 Pac. 370, this Court said, citing *State* v. *Weir* (Wash.) 31 Pac. 417:    ''Such conventions are, however, in our judg-ment, meant to be organized assemblages of electors or dele-gates fairly representing the entire body of electors of the political party which may lawfully vote for the candidates of any such convention.    In a similar case (*State* v. *Weir* [Wash.] 31 Pac. 417) the Supreme Court of Washington said:    'The plain intent of said section, when examined in the light of all the other sections upon the subject, makes it perfectly clear that the primary meeting or convention must be by or on behalf of the entire body of voters of the respective party who are to be allowed to vote at the election of the officers therein nominated.' ''    The facts in that case were that the regular Republican convention of Missoula county called for the pur-pose of nominating candidates for county officers only assumed also to nominate a candidate for the office of judge of the Fourth judicial district, composed of Ravalli and Missoula counties.    The electors of Ravalli county were not represented in the convention.    No notice of the purpose to make this nom-ination had been given.    The nomination was held to be void because the convention was not a body representative of the electors of the district.    The same conclusion was reached in *State ex rel. Russel* v. *Tooker,* 18 Mont. 540, 46 Pac. 530, 34 L. R. A. 315.    In this case it was held that a political club composed of 400 members, though regularly organized as such, and representing certain declared principles, was not an organized assemblage of electors representing a party or prin-ciple, so as to entitle the ticket named by it for public offices in the county to be printed upon the official ballot.    Again, in the case of *State ex rel. Metcalf* v. *Johnson,* 18 Mont. 548, 46 Pac. 533, 34 L. R. A. 313, where it appeared that a

body of 21 electors of Silver Bow county assembled without a call or notice other than personal invitation, and proceeded to hold county and state conventions, and to nominate county and state tickets under the designation of "Citizens' Silver Party," their action was held to be void both as to the state and county tickets, for the reason that the body was not such a representative body as the statute contemplates, it having assembled without the prerequisites of the call and notice necessary to give its proceedings due publicity, and to afford to those persons among the great body of electors in the county and state who were of the same mind an opportunity to take part in the proceedings. (See, also, *State ex rel. McLaughlin* v. *Bailey*, 18 Mont. 554, 46 Pac. 1116.) "The very underlying principle of convention organization is in *representation.*" (*State ex rel. Metcalf* v. *Johnson, supra*), Every elector of a particular party faith or belief is entitled to take part or to be represented in the conventions and primaries of his party when party measures are to be taken, or delegates are to be selected, to whom, under party rules and usages, authority is to be intrusted to name the party candidates and to preserve the party organization. He may or may not choose to attend, and interest himself in the councils of his party, yet he is entitled to do so, and any convention or primary which is held without reasonable notice in due time to afford such opportunity is not in conformity with the requirements of the statute. To hold otherwise would be to ignore the obvious purpose of the statute, and to render possible a condition of things in which the important rights of electors could be trampled upon and disregarded by disaffected or designing men with impunity, to the utter destruction of party organization, and the defeat of the purpose of the law.

In the light of these principles, the mass meeting held at Deer Lodge early on the morning of September 18th was not a lawful convention or primary. It was called without any notice to any person except to those who happened to be present. Within a few minutes it was engaged in the work of organization. The announced purpose was the formulation of

a protest to the state convention against the threatened action of the committee to take the protestants and ticket out of the party. The adjournment to 9 o'clock the same morning was but a continuation of the same meeting. No other notice was given in the meantime; and, even if there had been, sufficient opportunity was not given for others to reach the place of meeting to take part in its proceedings and make it a representative body. The dispersing delegates were hostile to the meeting and its purpose. Their impulse would naturally be to refrain from giving it validity by circulating the notice. The publication of the fact of the meeting as a matter of news did not alter the case, as this was not upon the authority of any one connected with the meeting. So far as the record shows, as has already been said, within a few minutes after the idea of holding such a meeting was conceived, the participants were engaged in effecting its purpose; and before the end of the forenoon it had finally adjourned. Its announced purpose was to formulate a protest. Its accomplished purpose was a full delegation at Helena asking for admission into the state convention as the regular party representatives from Deer Lodge county. Therefore the delegates chosen by it were not authorized to represent or bind the electors of Deer Lodge county. There being no proper representation of the electors in Deer Lodge county in the judicial convention, the nomination of the relator was of the same character as the one considered in *State* v. *Rotwitt*, and must be held to be invalid.

2. But the relator contends that the action of the state convention in seating the Kennedy delegates was final as to which faction of the party in Deer Lodge county really represents the Democratic party, and that, it having decided that the Kennedy delegates were entitled to seats, this adjudicated all questions as to the regularity of the mass meeting, and legalized the action of the Kennedy delegates. As authority for this contention the following cases, among others, are cited: *In re Redmond* (Sup.) 25 N. Y. Supp. 381; *In re Fairchild*, 151 N. Y. 359, 45 N. E. 943; *Cain* v. *Page* (Ky.) 42 S. W. 336; *Ex parte Sanders*, 53 S. C. 478, 31 S. E. 290.

To what limit courts should go in holding that party disputes should be settled in the judicatories of the party, and be left undisturbed, is a question which does not properly arise in this case. The question here already considered and decided arises upon the force and meaning of a part of the election law, and involves an inquiry as to whether the requirements of the law have been complied with, so as to render the nomination in question a valid one. To permit a political convention to determine such a question would be to say that political bodies possess judicial power, and may oust the courts of jurisdiction in matters which should fall within their cognizance. The statement of this proposition is its own refutation. So far as we are aware, no court has ever assented to this doctrine. Nor is any argument needed to support the statement that no action of a state convention can validate a nomination for the office of district judge where the convention making it does not properly represent the electors of the district. The right to nominate and elect these officers belongs to the electors composing the district. (Constitution, Sec. 12, Art. VIII.) The cases cited are, therefore, not in point. If there were no question here as to the legality of the mass meeting held on September 18th, the case presented would be altogether different, and would involve considerations which are not now pertinent. We hold, therefore, that the proof offered tending to establish the custom touching the nomination of judges of the district courts, as well as that showing the action of the state convention in the premises, is immaterial.

The conclusion thus reached is based upon the theory of this case presented by counsel in their argument, and upon which they rest their claim, viz., that all the delegates finally seated in the state convention were so seated because they were selected by the mass meeting of the 18th. There is a suggestion in the brief, however, that, inasmuch as three of these delegates were also selected by the regular convention of the 17th, and retained their seats in the state convention, they had power to act in the judicial convention for the whole

delegation, in connection with the three loyal delegates from Granite county, who in like manner were empowered to act for the whole delegation from that county, and therefore that the nomination of relator by the judicial convention in which these six delegates participated was the regular democratic nomination. The fact that 28 other Kennedy delegates also participated in the convention without authority from any source would seem to be an insuperable objection to this conclusion. But, waiving this objection, and giving full weight to the proof offered for the purpose of showing the usage of the party in connection with the nomination of district judges, we do not think it sufficient to show any usage which should be recognized. It is clearly shown that it has been customary in all parties in this state for the delegates to the state conventions from the counties forming judicial districts to meet in separate judicial conventions, and there nominate candidates for district judges; but it does not appear that such a nomination was ever made without express authority in these delegates to do so, except in one instance. The nomination for the Third district was thus made by the Democrats in 1896. The chairman of the Democratic state central committee was examined as a witness in this case, and stated that, so far as he knew, the usage prevailed as claimed by relator; but upon cross-examination he made it appear that he had no personal knowledge as to the calls usually made by the county conventions. There was no proof as to whether the call for the state convention contained any reference to candidates for district judges. Moreover, it appears that the central committee of Deer Lodge county, in calling the convention of the 17th, drew special attention to the matter of the candidate for district judge for the Third district, and the necessity of authorizing the delegates selected by it to act in the judicial convention. This tends to show that such usage was not recognized by the party authorities in that county. This proof clearly does not establish such a usage as would be recognized and enforced. Whether such a usage could finally become so established by uniform observance that it would be recognized

and enforced in the face of the constitutional provision already cited, giving the electors in the various districts the right to elect their own judges, we do not decide. In no event can such a usage be recognized until it has been so long and so uniformly observed that the presumption would obtain that the electors had knowledge of it, and acted upon it. From this point of view there was no authorized judicial convention.

It is therefore ordered that the alternative writ issued herein be vacated and set aside, and that this proceeding be dismissed, at the cost of relator.

*Dismissed.*

MR. JUSTICE WORD being a nominee of the Independent Democratic party of Montana, did not hear the argument, and does not participate in the decision of this case.