(5 Misc. Rep. 369.)

## In re REDMOND.

(Supreme Court, Special Term, Monroe County.   November 1, 1893.)

ELECTIONS AND VOTERS — PARTY CONVENTIONS — REGULARITY — DECISION BY STATE CONVENTION—EFFECT.
    A determination by the state convention of a party, on a contest between two delegations, as to the regularity of the conventions by which they were nominated, will be treated by the courts as conclusive.

At chambers.   Application of Edward M. Redmond for an order to compel the county clerk of Monroe county to print his name on the official Democratic ballot.   Denied.

Theodore Bacon and Ivan Powers, for the motion.
George Raines, opposed.

ADAMS, J.   This is a proceeding instituted under the provisions of section 65 of chapter 680 of the Laws of 1892. The applicant claims to be the regularly nominated candidate of the Democratic party for member of assembly in the second district of Monroe county, and insists that his name be printed, as such candidate, upon the official ballot to be voted at the ensuing election. The papers presented upon the hearing are exceedingly voluminous, and it is to be regretted that the limitations of time and opportunity render a more careful and deliberate examination of the same impossible. However, the essential facts of the case, and perhaps all which are material to its determination, are virtually conceded, and it may be well to recapitulate them in their chronological order: Prior to the year 1892, the county of Monroe contained 3 assembly districts, the second of which consisted of the 16 wards constituting the city of Rochester. In that year an enumeration was had, in consequence of which a readjustment of such districts was made. In the mean time the charter of the city of Rochester was revised in such manner as to increase the number of wards to 20, and to also obliterate, to a considerable extent, at least, former ward lines. The enumeration and readjustment just referred to were not followed by any change in the number of assembly districts in Monroe county, but the second district was made to include the first 9 and the Sixteenth wards of the city, while the remaining 10 wards

were divided between the first and third districts. This alteration of geographical lines so changed the territorial condition of each district as to leave the party without any duly-constituted authority to call conventions in either one of them, and in this emergency recourse was had to the city central committee, which assumed to act for the second district. A convention was called by this body, its authority to call the same being recognized and acquiesced in with practical unanimity; and at this convention, which was held on the 18th of October, 1892, the chairman of the several ward committees of the wards constituting the district were duly authorized to call future conventions. Before it became necessary for the committee thus constituted to take any action, the chairmanship of several of the ward committees, for various reasons, became vacant, and while this condition of things existed it became apparent that there were two hostile factions within the Democratic party of the county, each of which was attempting to obtain control of the party machinery. I do not deem it necessary to discuss the motives which actuated the contention of the rival factions, nor the methods which were employed to accomplish the object each was striving to attain. Upon this subject the affidavits are quite conflicting, but it is reasonable to assume that the methods which unfortunately obtain in all such contests were resorted to by each faction as the necessities of the case seemed to require. Be that as it may, it does appear that a committee, which it is claimed, and with apparent reason, consisted of the majority of the chairmen of the ward committees in the second assembly district, called a convention to be held on the 31st day of August, 1893, for the purpose of electing three delegates to the Democratic state convention appointed to be held on the 5th day of October following. In pursuance of this call, caucuses or primaries were held in the various wards constituting the district, and the convention duly assembled and elected delegates to the state convention. It is also made to appear that at the county convention held in the year 1892 a resolution was adopted, investing the county committee of the Democratic party with power to remove from office any and all ward and town district and city committees, and to provide, by calling new caucuses, for the appointment of new committees, and to prescribe all rules of procedure of party committees in the organization of the party and its conventions. After the call for the convention of August 31st had been issued, and several ward caucuses had been held, and the fact had become sufficiently developed that the factional warfare in the district had assumed such proportions as to render two conventions probable, the county committee was convened, and the representatives of the contending factions were summoned before it, but the one which, for the purposes of this proceeding, may be styled the Bendon faction, refused to acknowledge any supervisory power as residing in the county committee, and disregarded the summons. Thereupon, the county committee took action, and declared all conventions and caucuses theretofore called illegal, and in an address to its constituents set

forth what it is claimed were the reasons for its action, and also, provided for the holding of a convention in each of the assembly districts, and to that end prescribed rules and regulations for new primary meetings. This action on the part of the county committee was apparently acquiesced in by the party in the first and third districts, but, as has already been seen, the Bendon faction refused to surrender the advantage which it had gained, and as a consequence two conventions for the election of delegates were held, and two sets of delegates presented themselves for admission to the state convention. The contest thus precipitated upon the state convention was met by that body. A hearing before the proper committee was had. A report was made, and by a nearly unanimous vote the convention called by the county committee was recognized as the regular convention of the party. Its delegates were admitted, and the claims of the Bendon delegates were disregarded. Notwithstanding this action of the state convention, the Bendon committee continued to assume the right to represent the party, and proceeded to call a district nominating convention, which was held on the 13th of October, 1893, and at which the above-named Edward M. Redmond was placed in nomination for member of assembly. In the mean time another convention was called by the same authority, which was recognized by the state convention as regular, and this convention placed in nomination one Harry M. Schall. A certificate of each nomination, which appears to conform in all respects to the requirements of the statute, was filed in the office of the county clerk and that official thereupon decided that Schall was the regular nominee of the party, and that his name must appear upon the official ballot. It is to obtain a review and a reversal of the decision of the county clerk that this proceeding has been instituted.

The wisdom of the legislature in imposing upon courts and judges the duty of determining the regularity of political nominations is something which may well be questioned, for it is almost impossible to reach a conclusion in such a case without subjecting the tribunal which renders it to a charge of partisanship; and when this charge is once made, however unfounded it may be, its inevitable tendency is to bring the courts and the bench into disrepute. The present case is perhaps as free from such embarrassment as any similar case can possibly be; but at any rate the duty is imposed, and it is therefore one which must be met and discharged with the same ability and impartiality as any other duty, disagreeable and distasteful though it may be.

The act under which this proceeding has been brought is what is known as the "Election Law" of the state, and, however imperfect it may be in some of its provisions, its ultimate design is undoubtedly to promote the independence of voters, and to purify and regulate our public elections. The act, in a variety of ways, recognizes what the experience of all teaches,—that under our system of government the affairs of the state are conducted through the medium of the representatives of political parties, and that,

of necessity, such parties must, to a certain extent, provide for their conduct and management certain rules and regulations, which are not inaptly termed "party machinery." That such machinery is frequently employed to accomplish personal and factional ends cannot be denied. That it is sometimes used to crush any expression of sentiment by, and to defeat the desires of, a large majority of the political party it is supposed to represent, is undoubtedly true. But, nevertheless, the party cannot exist without its machinery, and if that machinery is used oppressively, and for improper purposes, the right and the power to remedy the evil undoubtedly reside in the party itself; and so it will be found that, in the fiftieth section of the act in question, provision is made for the conduct of political parties by means of conventions and primaries, and by such rules and regulations as those bodies may adopt. But, independent of said act, it is a fact so well known, and of such long-continued existence, as to entitle the same to judicial recognition, that political parties have their territorial divisions, and that while each division is, within certain limitations, a law unto itself, so far as the particular territory it assumes to represent is concerned, yet, by party usage, each of said divisions owes and yields allegiance to some higher power. To illustrate, it frequently happens that a county committee prescribes times and regulations for the holding of primary meetings, and party usage requires that the rules thus prescribed shall be observed. In the same manner, a state convention, like our state legislature, is the sole judge of the election of its own members; and when it has once passed judgment upon conflicting claims, where questions of regularity only are concerned, it seems to me that its determination should be accepted as final. Such determination may be unjust, it may be in direct violation of the equities of any given case, and, as contended by counsel, in theory it may be right and proper to disregard such an adjudication, and to insist that no party division may exercise any supervisory control over any smaller division. But, if such a theory were put into practice, it would be subversive of party discipline, and would reduce political parties to mere associations of independent and irresponsible mobs. No such rule as the one contended for obtains in any voluntary organization, but, on the contrary, the very term "organization" implies a recognition of order, and an obedience to duly-constituted authority. These observations lead, of necessity, to the conclusion that where a person allies himself with a political party he tacitly acknowledges allegiance to all the rules and regulations of that party, as enunciated or expressed by what party usage recognizes as the supreme or superior authority of the organization. The recognition of this principle does not compel one to follow blindly the dictates of party, nor to vote for incompetent or unfit candidates, for he still possesses the inalienable right of severing, either permanently or temporarily, his party relations. Neither does it prevent any person, with a sufficient number of followers who desires his election to any office, from being a candidate for that office in the manner

provided by the statute. But he cannot claim to be the nominee or representative of a political party unless he has been first regularly nominated by that party, and what constitutes regularity depends, as I think has been shown, upon the usages of the party itself, and not upon any rules or regulations which may seem just and proper to courts or judges. It follows that the applicant, having received his nomination at the hands of a convention whose claims to regularity have been submitted to the supreme authority within the party in the state, and which have by that body been declared unfounded, cannot be regarded as a regular nominee of his party, and is consequently not entitled to have his name printed upon the official Democratic ballot. His application must therefore be denied, and the decision of the county clerk affirmed.