STEPHENSON v. BOARDS OF ELECTION COMMISSIONERS.

1. POLITICAL CONVENTIONS—QUALIFICATIONS OF DELEGATES.

The decision of a political convention as to the qualifications of its own members is conclusive upon the courts.

2. SAME—TEMPORARY ORGANIZATION—PRESIDING OFFICER.

The custom that prevails in political conventions, of permitting the chairman of the party committee to preside until a temporary organization is effected, may be disregarded in a particular convention, although there are contesting delegations, between which, in respect to the right to vote upon matters of organization, the chairman is directed by the committee to decide.

3. SAME—NOMINEES OF RIVAL FACTIONS—JUDICIAL INQUIRY.

Courts will not, at least in the absence of a statute imposing the duty, attempt to determine as to which of the nominees of rival factions in a political convention regularly called, neither of which factions appears to have had a majority of the delegates admittedly entitled to seats in the convention, is the regular nominee of the party.

4. SAME—OFFICIAL BALLOTS—PARTY TICKETS—DUTY OF ELECTION COMMISSIONERS.

In such case the names of both nominees, if regularly certified, should be given places upon the ballot, the one with the general ticket of the party, the other in the next column, under the party name and vignette; the board of election commissioners deciding which shall go upon the general ticket.

*Mandamus* by Samuel M. Stephenson to compel the boards of election commissioners for the counties of the Twelfth congressional district to place relator's name on the official ballot as the regular congressional nominee of the Republican party in that district. Submitted October 18, 1898. Writ denied October 25, 1898.

*Brown & Trudell* (*H. Olin Young, Byron S. Waite,* and *Fred A. Baker,* of counsel), for relator.

*George Hayden* and *Gad Smith* (*H. H. Hatch; Harrison Geer, A. C. Cook,* and *J. H. Cole,* of counsel), for respondents.

HOOKER, J.   The relator asks a *mandamus* to compel
the several boards of election commissioners of the Twelfth
congressional district to place the name of the relator upon
the Republican tickets throughout the district as candi-
date for Congress, to the exclusion of the name of Carlos
D. Shelden, each claiming to be the nominee of the reg-
ularly called convention of the Republican party.   The
record shows that a congressional convention was called,
and the delegates assembled.   It is admitted to have been
a regularly called convention, and therefore its nominee,
if ascertainable, is lawfully entitled to have his name
printed upon the ticket.

At the appointed time a large number of persons as-
sembled.   Previous to its meeting, George A. Newett, the
chairman of the congressional committee, assembled his
committee, which, by a vote of three for and two against
the proposition, decided that the committee should ascer-
tain in advance what persons were lawful delegates from
those counties where there were contesting delegations,
and that such persons, and such only, should be permitted
to participate in the preliminary work of organizing the
convention.   For the purposes of this opinion it is sufficient
to say that two counties—Dickinson and Marquette—had
contesting delegations, and it appears to be admitted that,
leaving these counties out, there were 35 delegates who
favored the nomination of Mr. Shelden, and 31 who sup-
ported the relator.   Here, then, was one assembly, in
which 87 delegates were entitled to seats, and there were 66
present who are conceded to have been entitled to seats.
The chairman of the committee called the convention to
order, and, while reading or about to read the call for the
convention, a delegate whose right to a seat was unques-
tioned arose and said, ''I nominate Chase Osborn for
chairman,'' and himself put the question, and declared it
carried; whereupon Osborn, also a delegate whose right
to a seat is undisputed, appeared upon the platform, and
attempted to preside over the convention; and, as appears
by the proceedings of the convention set up in the return

of the respondents and affidavits accompanying the same, the business was proceeded with, credentials examined and passed upon, and Carlos D. Shelden nominated,. when the convention, or that portion which had not declined to take part in these proceedings, adjourned *sine die,* and its members left the hall. Meantime Mr. Newett, who occupied the same stage, had been elected chairman by a faction of the assembly, a secretary chosen, and committee on credentials appointed, who, after the lapse of a couple of hours, and therefore after the adjournment of the other faction, made a report seating delegations favorable to the relator, and, this being adopted, this faction nominated the relator, and adjourned *sine die.* The officers of each faction filed certificates of nomination with the several boards of election commissioners, and, while we do not find it explicitly so stated, it is perhaps inferable that in some cases these boards refuse to place relator's name upon the ballot, and that others are disposed to do so, to the exclusion of Mr. Shelden.

The relator contends that it was the right and duty of the chairman, acting under the direction of a majority of the committee, to preside over the assembly until the convention should be organized, and to determine who were entitled to vote in effecting such organization, and that the organization of a meeting through the election of Mr. Osborn as chairman was irregular and void, and that the organization perfected by the other faction was the only valid organization, and therefore the only "regularly called convention" whose nominee the law permits to have a place upon the ballot. Political conventions are deliberative bodies, supposed to be made up of representatives of a political party, who assemble at the appointed time and place for the purpose of holding the convention. The delegates usually come armed with something in the nature of credentials which tend to show that they are there by authority; and it has usually been supposed that the assembly itself passes upon the authenticity and sufficiency of such credentials, and it has been quite common

for conventions to admit bystanders from an unrepresented district to seats as representatives of their locality,
although without other authority.   While it has doubtless
been the common practice for chairmen of political committees to use the gavel to procure order and silence, to
read the call, and then to ask the assembly its further
will or pleasure, and put motions until a temporary chairman is chosen, we have not understood it to be the province of the chairman to do more, or so much even, if
against the will of the assembly.   Certainly, we know of
no rule of law authorizing it.   The assembly is a law unto
itself, and has uniformly been the judge of the qualification of its own members, and its decision final.

The contention of the relator seems to be based upon the
assumption that the assembly cannot be trusted to faithfully discharge the duty of sifting out the disqualified, and
that for that reason there must be some outside authority
which shall have power to determine what individual
members of the assembly are *prima facie* authorized
delegates, and what are not, to the end that the convention shall be legally organized; and the claim that party
custom has conferred that power upon the committee.   It
is said that outsiders may capture the convention under
any other rule, or that enough contesting delegates may
be sent to control the assembly, thus frustrating the will
and thwarting the intentions of the constituency.   To
this the opposition retorts that the relator's theory is a still
better scheme for perpetrating fraud and thwarting the
popular will, placing it within the power of a majority of
a committee to recognize the partisans of a particular candidate to an extent sufficient to control the organization
and the seating of delegates, thereby making his nomination sure and the convention a farce.   These difficulties
do not now present themselves for the first time.   From
our earliest recollection party politics has always been a
matter of shrewdness and management, not always defensible; yet the people have been left to deal with the difficulties as they arise.   It is not to be supposed that com-

mittees on credentials, however fairly selected, have always dealt justly; and, no doubt, expediency or political exigency has governed their action, to the exclusion of abstract justice. The remedy has usually been either a bolt on the part of the dissatisfied, and the selection of an opposition candidate within the party, or a refusal by the electors to support the nominee; and the courts have been careful not to interfere with the application of these remedies, which have usually been found adequate.

Nothing is more certain than that, when this assembly met, it constituted what the law calls "a regularly called convention;" and, had there been no split, the right of its nominee to a place upon the ticket could not have been successfully questioned upon the ground that it was organized upon the motion of Hambitzer, instead of under the leadership of Newett. But it did split; and we must do one of two things, viz.: Either follow the precedents, and say that we will not decide between the rival factions, or ourselves decide who were the lawfully elected delegates to the convention. To do this, we might be called upon to investigate every ward or township caucus and county convention held in the two disputed counties, and, had either side asked it, throughout the district. We have intimated that the assembly is the judge of the qualification of its members; and that back of its decision we cannot go. Its presiding officer is its creature, and it must protect itself. In turn, its voters must protect themselves against fraud upon their convention or misconduct of its delegates, officers, and candidates; and when a considerable faction of a convention leaves the meeting, and nominates a ticket, claiming to be the representative of the party which called the convention, it is not the province of the courts to determine upon technical grounds that it is not, and that its action is void, and deny it a place upon the ballot, thereby defeating the purification of methods within the party, or to say which faction was right and which wrong. It is a right of the voter to repudiate wrong and corruption and fraud, if it exists, and to pre-

vent, or unearth and defeat, corruption, and he should not be hampered by technical rules. If in this case this convention was unable to conclude its business in harmony, and the delegates divided and made two nominations, they should not be denied the privilege of going to the polls with both. Each nominee is here contending that he represents the only pure republicanism of the district, and is the lawful nominee of the true party. The electors must decide between them. In such case we know of no way of determining which of these names ought of right to go upon the Republican ticket. If it were left to the voters, there would doubtless be an honest difference of opinion upon the merits of the question. · The same may be true of the boards. They may not know what they should do, and we cannot tell them further than to say that, under the admitted facts and the precedents, both are entitled to places upon the ballot.

It has been held in this State that, where rival factions of a regularly called convention of a party nominate and certify different tickets, the election commissioners have no authority to accept one, to the exclusion of the other; and it was held, further, that, under such circumstances, both tickets should be printed upon the ballots; and it was said in that connection that the name of the party as certified should be placed above the ticket, without further addition or distinctive designation than such as was contained in the certificates furnished. See *Shields* v. *Jacob*, 88 Mich. 164 (13 L. R. A. 760). That case arose under Act No. 190, Pub. Acts 1891, which provided for what is ordinarily called an "Australian Ballot," requiring the adoption of a vignette by each party, under which the party ticket was required to be printed.

A similar question arose in Colorado the next year, under a law of like character, which provided that the officer with whom the certificate was filed should pass upon objections seasonably filed. At a convention regularly called, a disagreement arose, which resulted in a division and two tickets; each faction claiming to repre-

sent the party, and each filing the certificate provided for by the statute.    It was claimed that the secretary of state had authority to determine which ticket was entitled to a place upon the ballot; but the court held otherwise.    It was said that his power extended only to the correction of informalities.    The court said:

" As to what were the duties of the secretary of state under the circumstances of this case is still, however, to be decided.    Here we have to deal with two conventions, each claiming the right to represent the same political party.    The act itself will be searched in vain for any provision for such a contingency.    It was not contemplated by the legislature, and therefore not provided for.    It should not be a matter of surprise that the act as originally passed is not perfect in all particulars.    The beneficent laws of the world have grown with time, as the result of experiment and amendment.    There being no provision in the act for a condition such as we have presented in this case, some have reached the conclusion, upon reading section 3 of the act [ Sess. Laws 1891, p. 143 ], that the secretary of state could only certify one ticket as the ticket of the Democratic party, and that, therefore, of necessity, the duty devolved upon him of determining which of these conventions was entitled to speak for the Democratic party of the State of Colorado.    Certainly a court would be doing violence to the intelligence of any legislative body to assume that it was intended that such a question could be determined within 48 hours from the time objections were filed.    The validity of the organization and acts of each convention is embraced in the controversy, the determination thereof involving party usages, party practices, and party principles, necessitating, perhaps, the taking of evidence of witnesses living at widely separated points.    The section of the act under which it has been claimed the duty devolves upon the secretary of state to determine which convention is entitled to represent the Democratic party applies to county, city, and town clerks equally as well as to the state officer.    It is as follows:

" 'SEC. 3. Any convention of delegates of a political party which presented candidates at the last preceding election, held for the purpose of making nominations to public offices, and also voters to the number hereinafter specified, may nominate candidates for public

offices to be filled by election within this State. A convention, within the meaning of this act, is an organized assemblage of voters or delegates representing a political party which, at the last election before the holding of such convention, polled at least ten per centum of the entire vote cast in the State, county, or other political division or district for which the nomination may be made. A committee appointed by any such convention may also make nominations to public office when authorized to do so by resolution duly passed by the convention at which such committee was appointed.'

"The argument upon this section is that, to entitle the convention of any party to nominate candidates for public offices, such party must have polled at least ten per centum of the entire vote cast in the State at the last preceding election, and that only one set of nominations can be filed by a single political party. That the argument has force will be admitted. It is quite probable the legislature had in contemplation the nomination of one ticket only by a political party, as the statute makes no provision for the condition with which we are confronted. In this case we have two certificates of nomination, each in apparent conformity with the law. As we have shown, the secretary of state is not empowered to decide as between these certificates. Therefore it is his duty to certify both tickets to the county clerks, in order that both may be printed upon the official ballots. By pursuing this course, the merits of the opposing candidates will be submitted to the people, the tribunal under our system of government that must ultimately pass upon such questions. The conclusion that the secretary of state should, under the circumstances, certify both sets of nominations to the county clerks, to be printed upon the official ballots, is in harmony with the rule of construction which requires the courts, in cases of doubt between two constructions, to follow that which will afford the citizen the greater liberty in casting his ballot. This is in accordance with the previous decisions of this court. In the case of *Kellogg* v. *Hickman*, 12 Colo. 256, Mr. Commissioner Stallcup, in an able opinion, which was adopted by this court after careful consideration, held that this should be the policy of the courts. See, also, *Allen* v. *Glynn*, 17 Colo. 338 [15 L. R. A. 743, 31 Am. St. Rep. 304]. The severe penalties provided by the act for the filing of a false certificate of nomination will, we think, furnish a sufficient safeguard against fictitious certificates; if not, the power is in the legislature to provide adequate protection.

"Little weight should be attached to the argument that the voters may be deceived by having two Democratic tickets in the field. At one time, no doubt, voters were often misled by having names printed under certain designated headings that did not properly belong thereunder. But this deception was only accomplished by secrecy, and by the lateness of the hour at which such irregular tickets were distributed, usually only upon the day of election. But, under the present law, the danger of deception in the manner indicated is certainly reduced to the minimum. The secretary of state is required to certify these tickets to the county clerks, and the county clerks must, in turn, cause the same to be published several days before the election. Thus the fullest opportunity to expose fraud and prevent deception is provided for. In the present instance, different emblems were selected by the two conventions, and this furnishes an additional safeguard against deception." *People* v. *District Court*, 18 Colo. 26.

*Phelps* v. *Piper*, 48 Neb. 724 (33 L. R. A. 53), was a case where different conventions, called by different committees, but both claiming to represent one and the same party, held conventions at different times and places; and the question of the right of one ticket to a place on the ballot came before the court of last resort. It was held that both tickets were entitled to places upon the ballot. The court said:

"The relator, by this proceeding, seeks to prevent the certification of the candidates of the Lincoln convention as Democratic candidates. If the action of the secretary of state can be controlled by the court in this manner, it must be because it is his duty in such case to determine, as between two bodies or factions, each claiming to represent a political party entitled to have its candidates' names placed upon the ballots, which of such bodies or factions, according to the rules and customs of such party, rightfully represents it; and, further, that, when the secretary fails to so adjudicate such question, the court shall determine it, and issue its mandate to the secretary of state accordingly. To our minds neither proposition is tenable. Indeed, we think that the case of *State* v. *Allen*, 43 Neb. 651, is conclusive on the first question, at least. It was there held that it is not the province of the secretary of

state to determine which of two rival state conventions of the same party is entitled to recognition as the regular convention; and, further, that where two factions of a political party nominate candidates, and certify such nominations to the secretary of state in due form of law, the latter will not inquire into the regularity of the convention held by either faction, but will certify to the several county clerks the names of the candidates nominated by each, such practice being in harmony with the rule which requires courts, in case of doubt, to adopt that construction which affords the citizen the greater liberty in casting his ballot.  In the case cited, candidates representing the same faction as that represented by the candidates which we will here, for brevity, designate the 'Mahoney Ticket,' applied for a *mandamus* to compel the secretary of state to certify their names as the candidates of the Democratic party, the secretary having refused to do so.  The court denied the writ, holding as we have already stated, and, further, that, the record not disclosing that the relators had been nominated by any convention whatever, the secretary of state could not be required to certify the nominations, because it is his duty to determine, in the case of a certificate filed with him, whether such candidates were in fact nominated by a convention or assemblage of voters or delegates claiming to represent the party; that is, he should satisfy himself of the genuineness of the certificate. But he has no authority, where a convention in good faith, claiming to represent the party, has in fact certified its nominations to him in due form, to refuse to recertify the same to the county clerks.  We entertain no doubt of the correctness of the principles announced in that case; and it follows that the court, by a writ of *mandamus*, cannot compel the secretary of state to perform an act which he has no legal authority to perform.  If it was the duty of the secretary to certify both sets of nominations, and if he had no power to determine, between the rival factions, which faction represented the Democratic party, then it seems perfectly clear that the court can neither require him to make such decision, nor can the court itself determine which faction rightfully represents the party, and upon such determination require the secretary to omit from his certificate one set of candidates, which *State* v. *Allen* declares it is his duty to include in the certificate.

"The legislature has not provided any means for determining such controversies.  Political parties are voluntary

associations for political purposes. They establish their own rules. They are governed by their own usages. Voters may form them, reorganize them, and dissolve them at their will. The voters ultimately must determine every such question. The voters constituting a party are, indeed, the only body who can finally determine between contending factions or contending organizations. The question is one essentially political, and not judicial, in its character. It would be alike dangerous to the freedom of elections, the liberty of voters, and to the dignity and respect which should be entertained for judicial tribunals, for the courts to undertake in any case to investigate either the government, usages, or doctrines of political parties, and to exclude from the official ballots the names of candidates placed in nomination by an organization which a portion, or perhaps a large majority, of the voters professing allegiance to the particular party believe to be the representatives of its political doctrines and its party government. We doubt even whether the legislature has power to confer upon the courts any such authority. It is certain, however, that the legislature has not undertaken to confer it."

The case of *State* v. *Johnson*, 18 Mont. 556, arose under a similar statute, and bears a striking resemblance to the present case. The convention was regularly called, but trouble arose when the secretary of the committee attempted to call the convention to order. In the confusion that ensued, some of the delegates withdrew, and assembled at another place, claiming to act under the regular call. Each faction nominated a full ticket. The question of the respective rights as to places upon the ballot reached the supreme court of Montana, which disposed of the question as follows:

"The question is simply one of the relative rights of rival factions within the ranks of the regularly elected delegates. Such a contention, under all the facts of the case, it is well to leave to the electors to determine. They cannot well be misled, because the names of the two factions should appear under different heads on the ballot, and each faction will appear but once. At all events, we shall follow the rule laid down in *Phelps* v. *Piper*, 48 Neb. 724 [33 L. R. A. 53], and decline to interfere."

It is observable that all the cases cited deny the authority of the officer or court to determine that the candidate of one or the other of two factions of a party is regularly nominated, and entitled to a place upon the ballot, where the statute has not expressly or by necessary implication conferred the power. Several of these question the expediency of committing such power to either, and some doubt the power of the legislature to pass such a law. There are several decisions in the State of New York which hold that the courts have authority to pass upon such questions, and determine, between factions of a party, the right to a place upon the ticket. These decisions are not adjudications by the court of last resort, however, and they arise under a statute expressly conferring the power. In the year 1897 a case was decided by the court of appeals (*In re Fairchild*, 151 N. Y. 359), where it was held that the action of the party authorities—*i. e.*, conventions and committees—should be recognized as of controlling importance. We do not understand from what we are able to gather from the case that it was held that such decision was final or binding upon the court, but that it was proper to follow the determination of the party authorities; but, be that as it may, the important fact that the statute of New York expressly gives the courts jurisdiction in such cases does appear. So, it is not at variance with the other cases cited, except as some of them doubt the wisdom and others the constitutionality of laws permitting courts to decide one of two rival factions regular. The laws of New York provide that in such a case as the one then under consideration, viz., when two factions claim the same device or name, the secretary of state shall decide such conflicting claims, "giving preference of device and name to the convention or primary, or committee thereof, recognized by the regularly constituted party authorities." The constitutionality of such laws does not seem to be questioned in the New York case. The case is interesting, if not important, for its bearing upon the claim made here that the State convention de-

termined between the rival factions in this case. But we are not disposed to follow it, in the absence of a statute requiring courts to settle these questions. See, also, *In re Redmond*, (Sup.) 25 N. Y. Supp. 381, and *In re Pollard*, Id. 385.

As illustrative of the kind of difficulties which arise when the legislature imposes these duties upon the courts, one of the New York cases may be cited, viz., *In re Woodworth*, (Sup.) 16 N. Y. Supp. 147. That was not the first time that the matter there litigated was before the courts, as will be seen later. It was a proceeding under a statute to compel a county clerk to print the names of certain parties claiming to be regularly nominated candidates of the Republican party of the county, and its determination involved an adjudication between rival factions (each claiming to be the regular organization) of the regularity of their respective nominations. At the outset the court expressed reluctance, saying:

"This simple statement of the nature of the duty imposed is sufficient to indicate that it is one from which any judicial officer would gladly escape, were it possible to do so without disregarding the plain mandate of the law-making power of the State."

Objections were filed to the certificates, and passed upon by the county clerk, and then presented to the court, *as the law provided*. The court said that the certificates were regular, and that it was therefore necessary to go into extrinsic facts. These disclosed that the county convention split, and, as there were contesting delegations from four towns, which sent delegates enough to control the convention (in view of the fact that the undisputed delegates were evenly divided), it was only possible to determine which faction had a majority by ascertaining which of the contesting delegations were entitled to seats. This the court proceeded to do by investigating the proceedings at the caucuses. For convenience, we call the respective factions "Patterson" and "Mongin." Each faction had a town committee and a town caucus, and a

judicial inquiry was had after the caucuses were called, and the same court decided in favor of the Patterson caucus; but the opinion says: "That fact did not deter the Mongin party from holding the caucus which elected Mongin and four others to represent the town of Waterloo in the county convention." Without discussing the details of the caucuses held in the other three towns, we will come at once to the county convention, and here we find a striking resemblance to this case. The opinion states that—

"Previous to the hour appointed for the convening of the convention, a meeting of the county committee was held. This committee, with a single exception, was composed of persons in sympathy with the Mongin wing of the party; and at the meeting in question it was determined to place upon the roll of delegates the names of the Mongin delegates from the towns of Waterloo, Fayette, and Tyre, while the delegation from the town of Varick was made to consist of 5 Patterson delegates, together with 5 other persons, who made no pretense to an election by any caucus whatever, and each of said delegations was given the privilege of casting one-half a vote. It was further determined that the chairman of the committee should call the convention to order, and declare J. B. H. Mongin, of Waterloo, a pretended delegate, whose title was absolutely without foundation, its chairman. It was also determined that no one should be admitted to the hall unless provided with tickets furnished by the committee, and, to carry this provision into effect, policemen were stationed at the door. As thus constituted, the convention, when it assembled, consisted of 15 Mongin and 15 Patterson delegates whose election was not contested; 10 Mongin delegates from the towns of Waterloo and Fayette, who, as it has been made already to appear, had no right upon the floor of the convention; 5 Mongin delegates with half a vote from the town of Varick, who could not, under any circumstances, make any just claim to an election; and 5 Mongin delegates from the town of Tyre, concerning whose election there was, to say the least, grave doubt.

"The programme thus outlined by the action of the county committee was carried out to the letter, and, when an attempt was made on behalf of the Patterson faction to

substitute the name of a delegate whose title to a seat was uncontested for chairman of the convention, the motion was not entertained by the chairman of the county committee. A committee upon contested seats was then appointed, which committee, within half an hour after its appointment, and without affording an opportunity to any one to be heard, reported in favor of seating the delegates placed upon the roll by the county committee. At this point in the proceedings the delegates from the towns of Ovid, Romulus, Varick, and Junius withdrew from the convention, and organized a separate convention in another place, which was participated in by regularly elected delegates from the towns of Waterloo and Fayette, and also by the Patterson delegates from the town of Tyre; and proceedings were had which resulted in the nomination of persons whose names it is demanded in these proceedings shall be printed upon the official ballot. This body was composed of at least 30 delegates who were duly and fairly elected, while the Johnson Hall convention contained, at most, only 20 whose election, by any stretch of the imagination, can be claimed to be valid. It would seem, therefore, that, within the letter as well as the spirit of the act in question, the former body constituted 'an assemblage of voters or delegates representing' the Republican party of Seneca county.

"But it is insisted that a political convention is a law unto itself, and that whatever methods it adopts for its own government are conclusive, and cannot be made the subject of judicial inquiry. To a certain extent this contention may be, and doubtless is, true. It certainly was presented with the most consummate force and ability by one whose experience in and knowledge of such matters lends great weight to his opinions. But, where the duty is cast upon courts and judges of determining the regularity and fairness of political methods, those methods must be subjected to the same tests as would those of any other body of men whose good faith is questioned; and no court or judge would be justified in sustaining them when found to be inconsistent with that degree of sound morals which must characterize an ordinary affair of business, even though they be recognized and approved by senatorial and state conventions of the same political organizations. The trend of public opinion, as well as of legislation, at the present time, appears to be in favor of a radical reform in our political methods; and it is the plain duty of all good

citizens, and especially those clothed with judicial authority, to encourage such a sentiment with all the force they can command."

In short, the court assumed to determine who were the lawful delegates, and held that the faction having the largest number of such delegates was entitled to a place upon the ticket, irrespective of the regularity or irregularity of the organization or action of the convention, upon the assumption, we suppose, that it was a deliberative body only in name, whose delegates would blindly vote for the candidate favored, without deliberate consideration of merits.

But the case did not end here. It came again before the same court, and we quote from the opinion:

"The controversy which has resulted in this application is one which arose in the year 1891, between conflicting factions of the Republican party in Seneca county, each of which claimed to be regular in its organization. At the time mentioned, a proceeding similar to this was instituted for the purpose of obtaining a judicial determination of the matter; and, after a careful examination of the papers submitted, I found myself constrained to decide in favor of that element in the party known as the 'Patterson Faction,' and my reasons therefor were stated in an opinion which was designed to cover all the facts of the case. *In re Woodworth*, (Sup.) 16 N. Y. Supp. 147. This decision was subsequently affirmed by the general term (64 Hun, 522), and the following year was approved by my learned associate, Mr. Justice Bradley. Notwithstanding these several adjudications, every state convention, and every judicial, congressional, and senatorial convention of the district in which Seneca county is located, which has been held since they were rendered, has seen fit to ignore the same, and to recognize the opposing or Mongin faction as the only lawful representative of the party. The Patterson delegates have been refused admission to all of these conventions to which delegates were sent, while those of the Mongin faction were received into full fellowship, and the county committee of that faction has been made the custodian of such funds and documents as were distributed by the state committee. This being the situation, I am again asked to determine the question of regu-

larity upon facts which, other than as above stated, are precisely the same as those which existed at the time the first adjudication was had. The proposition, therefore, which presents itself, is simply this: Shall the precedent which has been established by courts and judges, or that which has been established by political conventions, be followed?

"When this controversy first required a judicial determination, it became necessary to decide it upon such facts as were established by affidavits, unaided by the action of any convention of the party; and, as those facts were thus made to appear, I had no difficulty in reaching the conclusion before mentioned. I am still satisfied that such conclusion was justified, and should now adopt it without hesitation, were it not for the fact that a different one has been so uniformly reached by the party conventions. In determining a question similar to this which arose in Monroe county (*In re Redmond*, 25 N. Y. Supp. 381), where the question of regularity had been passed upon by the state convention of the Democratic party, I have just held that the action of that body must be regarded as conclusive; and I see no reason why the same rule should not obtain in this case. The only difference is that here the state organization did not pass upon the question until after it had been determined judicially; but, nevertheless, both factions submitted their claims to that body and, for the reason stated in the opinion in the *Redmond Case*, I think the defeated party must now acquiesce in its decision. I am aware that this view is at variance with the one expressed by me upon the former hearing, and it likewise appears to be in conflict with that entertained by Mr. Justice Bradley in his opinion in this same matter; but, so far as any contrary view appears in my own opinion, it will be found to be merely the expression of an opinion which was not called for by the facts of the case, and it is one which, upon more deliberate reflection, I am disposed to modify. The conflict between the views here expressed and those of Mr. Justice Bradley is more apparent than real, inasmuch as it now appears that, since his decision was made, the regularity of the Mongin faction has been passed upon by several additional conventions, and that the opposing faction has so far acquiesced in their decisions as to omit in more than one instance to make any further demand for recognition.

"I still think, as already stated, that the title to regularity of the Patterson faction was pretty clearly estab-

lished upon the original hearing, and that it would, in view of the provision of the statute which authorizes this proceeding, have been no more than courteous for the party conventions to have adopted the decision of the general term, which was deliberately made, after a careful and impartial hearing; but there is no way in which they can be compelled to do so, and consequently it seems to me that the only rule for courts and judges to adopt in this and all similar contests is that they will interfere only in cases where there has been no adjudication of the question of regularity by some division of the party which is conceded to be superior in point of authority to the one in which the contention arose, provided, of course, that the question of good faith in the making of such adjudication is not involved. The adoption of a different rule would inevitably tend to bring party organizations and the courts into unseemly conflicts over questions which are peculiarly within the cognizance of the former tribunals,—a result which most certainly ought, if possible, to be avoided." *In re Pollard*, 25 N. Y. Supp. 385.

Thus, it will be seen that Mongin and politics triumphed over the judicially determined rights of Patterson. A more unseemly and humiliating chapter is not to be found in the history of jurisprudence in this country, and it is all due to the misguided attempt to impose upon the court the duty of presiding over political conventions and caucuses through the medium of actions or proceedings at law, unfitted for the purpose. In the *Case of Fairchild*, 151 N. Y. 359, the matter was not disposed of until after the election, and therefore, when heard and decided, involved only a question of costs.

In the case before us, had issue been joined, and the case sent down for trial of the facts, it is not improbable that it would be still dragging along when the term of office for which the parties are candidates shall have expired.

We have seen that this court held in the *Shields Case* that the tickets of both factions were entitled to places upon the ballot. The same is true in this case, unless we can find a change in the law forbidding it, and requiring us to determine which ticket is entitled to the place.

Another case where two factions resulted from a regularly called convention is that of *Beck* v. *Wayne Co. Election Com'rs*, 103 Mich. 192. The application prayed that the respondents be required to rescind their action in placing the name of Joseph R. McLaughlin upon the ballot as candidate for senator, and to place thereon the name of Robert Y. Ogg. The application was denied. The court discussed several subjects bearing upon the question which faction had a majority of the delegates, and held that the convention was regularly called, and that, after the retirement of the supporters of Mr. Ogg, a majority of the delegates elect remained, constituting a valid convention, and nominated McLaughlin. The court was able to say this from the undisputed facts upon the record. It might also have denied the writ upon the authority of *Shields* v. *Jacob*, both cases having arisen under the same law. This case does not discuss *Shields* v. *Jacob*, and cannot be said to overrule that case, or even cast doubt upon its correctness, unless it is to be implied from the disposition of the case upon other grounds.

The next case that received the attention of this court was *Baker* v. *Wayne Co. Election Com'rs*, 110 Mich. 635. That was not a case where rival factions asserted an exclusive right to a place upon the ballot, but was a controversy over the question of the order in which the tickets should be placed thereon. The crucial question in the case was whether the party represented by the relator, known as the Democratic People's Union Silver party, was entitled to be printed in the second column as the representative of the Democratic party of the previous election. It was conceded upon all hands that, if it was such representative, it was entitled to second place. The facts upon which the case turned were undisputed, and the question was one of law. The application was denied. Some language in the opinion is thought to have a bearing upon the question before us, and is cited in support of the claim that we have recognized the authority, if not duty, of the commissioners and courts to determine the questions of

fact upon which the order of tickets upon the ballot depends, and that they must therefore decide all questions of regularity. It is as follows:

"The reluctance of the courts to enter upon an inquiry, or to permit an inquiry by the election commissioners, into the question of fact as to which of two contending factions truly represents a political party, has been manifested in various cases. *State* v. *Allen*, 43 Neb. 651; *Phelps* v. *Piper*, 48 Neb. 724 [33 L. R. A. 53]; *Shields* v. *Jacob*, 88 Mich. 164 [13 L. R. A. 760]. In *Shields* v. *Jacob* it was held that the court would not undertake to determine which of two rival conventions, resulting from a split in a regularly called convention, should be treated as the regular convention of the party; and a *mandamus* was issued requiring the election commissioners to give to both tickets a place upon the ballot. At the time that decision was rendered, however, the provision requiring that the ticket of the party having the greatest number of votes within the county at the last preceding election should be placed first upon the ballot, and that the position of other tickets should be governed relatively by the same rule, was not a part of the statute, and it was not necessary to determine which of these tickets should be placed first on the ballot. Under the law as it now exists, such an investigation seems necessary, and it would seem that the commissioners did determine the question, and place the Shelby ticket second on the ballot."

Two questions were involved in the determination in that case: *First*, the identity of the parties; and, *second*, their previous votes as compared with those of others. About neither of these is there much opportunity for dispute over the facts, and little danger in leaving the subject to the election boards. In that case it was stated that the facts were not in controversy.

We are not dealing with a case in which a candidate has been nominated in a regularly called convention, by a majority of the delegates regularly elected, and admittedly entitled to seats in the convention, or shown by the undisputable evidence to be entitled to seats therein, as was the case in *Beck* v. *Wayne Co. Election Com'rs*, 103 Mich. 192. In such a case the question presented may be a mere

question of law, and the candidate regularly nominated entitled to a place on the party ticket, to the exclusion of one who may have been nominated by the refractory minority.

It is urged that the statute assigning certain places upon the ballot gives rights to candidates which may be enforced by the court, and that, if the courts may determine the *status* of parties, they may also determine ·between factions of one party; and the effect of this contention, if sustained, would be to open up the entire field, and make it incumbent upon courts to investigate the regularity, not only of conventions, but caucuses and primaries as well. We think there is a marked distinction between determining the places to be given to two different tickets upon the ballot, and denying to a faction of a party any place whatever. If this claim does not ascribe undue weight to the alleged rights of the candidate, and too little to public interests, it is at least true that judicial methods are too slow, and are inadequate to effectively and justly settle the questions which arise from political contests. Among the dangers that courts should guard against is the unwarranted assumption of power under the false impression that they, and they only, can right all of the wrongs which arise from the conduct of public affairs. They have only such powers and authority as the Constitution and the laws confer upon them. We have seen that several courts have held that not until the intention of the legislature is clearly manifested will they undertake to control political action. We have held in the *Baker Case* that it was the province of the court to decide the *status* of political parties upon admitted facts; but we think it does not follow that it was intended that we should go further, and settle all political controversies. Under the law as expounded in the case of *Shields* v. *Jacob*, the commissioners had no authority to decide between these two factions. It was their duty to print both upon the ballot.

It may be said that under the law of 1895 (Act No. 17,

Pub. Acts 1895, § 10), providing that "it shall be unlawful for said board of election commissioners to cause to be printed in more than one column on the ballot the name of any candidate who shall have received the nomination by two or more parties or political organizations for the same office," one or the other of the nominees will be at the disadvantage of having his name appear in a column by itself, as in the *Todd Case. Todd* v. *Kalamazoo Co. Election Com'rs,* 104 Mich. 485 (29 L. R. A. 330). We think, however, that the public good requires the private inconvenience; and we cannot hold, in the absence of a statute requiring it, that the nominee may stickle for a comparatively unimportant right, to the general public inconvenience to result from his pursuit of an unauthorized remedy of doubtful efficacy and expediency.

It may be asked which of these nominees should be subjected to this disadvantage. Manifestly, we have no means of determining this question, nor can we lay down the rule for such a case as this further than to say that their names should appear in adjoining columns.

It is therefore ordered that the several respondents give to the names of the nominees adjoining columns, said respondents themselves determining which shall be placed upon the general ticket of the Republican party, the other to be in a separate column under the party name and vignette; the full ticket to be placed first upon the ballot. No costs will be allowed.

The other Justices concurred.